Good morning. Good afternoon, Your Honor. I'm all used to good morning. Bonnie Williams on behalf of Alexander Guerro. I'm an assistant federal public defender and I'm going to very briefly, two minutes, discuss sufficiency of the evidence. The maritime forward looking infrared camera operator recorded everything up until the two Coast Guard vessels arrived at the suspect vessel for 30 minutes. He never saw anyone throw anything overboard, nor try to flee or use diversion tactics. Thereafter, it took two and a half hours after the vessel sank for the Coast Guard to locate the debris field. This case has none of the factors in Wilchcombe or Teneco, which were the two cases relied on by the government. First of all, there were no drugs ever observed on this vessel. There were no diversionary tactics undertaken. The voyage was not long. Both defendants said it was going to go on for two days, I think from the 24th through the 26th of November. Both Wilchcombe and Teneco with the defendants in those cases were arguing mere presence on a boat very full of drugs. In Wilchcombe, actually the co-defendant testified that the drugs were on the deck of that boat. In this case, there was absolutely no evidence that the drugs were ever on this boat. Not even the usual ion scan evidence that we have frequently in these cases. No evidence of a conspiracy among the defendants, no captain, no conversations among the defendants. There is simply not sufficient evidence to sustain the convictions even in the light most favorable to the government, and a reversal is warranted. Thank you. If there are no questions, then I will sit down. Well, you did not reserve time. I did not. Well, we were happy you were here. Good to see you. Mr. Fagenbaum, good afternoon. Good afternoon. Please, the court. I'm here on behalf of Appellant Pena Valloy. Your Honors, here's what the jury heard in closing argument from the government. Now, ladies and gentlemen, also what's important and what you must, what you must consider during your deliberations is what the defendants didn't say when the Coast Guard arrived on the scene. So, that's in Docket Entry 110, pages 105 to 106, and what we have here, members of the court, is that according to the government, the jurors had to consider, had to consider a Fifth Amendment violation when deciding the issue of guilt or innocence. According to the government, what the jurors had to consider was the defendants' silence when deciding whether there was proof beyond a reasonable doubt of guilt. So, the jurors get an instruction that says, and if the defendant chooses not to testify, you cannot consider that in any way while making your decision, but that's the defendants' in-court silence. It's not the defendants' out-of-court silence after he's been arrested and before he gets Miranda. So, of course, we're all aware that there is Eleventh Circuit precedent in Wilchcombe and Rivera, but we also have, from the Eleventh Circuit, in the form of Judge Jordan's concurring opinion in Wilchcombe, that, in his words, the current precedent on this issue is misguided. Now, Judge Jordan realized that... What are we supposed to do about this? Well, Your Honor, one option, I guess I could have asked for the court to consider this issue in bank. I did not do that. I don't have an excuse why I didn't do that, but... So, on our hands tied? Well, I believe there's two options, Your Honor. First of all, from what I gathered from Judge Jordan's concurring opinion in Wilchcombe, he said that he didn't think that he would recommend... He did not want to recommend Wilchcombe for in-bank consideration because he didn't think the particular facts of Wilchcombe lent themselves to an in-bank consideration. So, I realized, you know, by reading that, the court has the option, if it wanted to do it, and then, I believe Judge Martin, in the Alexander case, in which there was a procuring opinion that you participated in, in 2017, it said that, although the Alexander court, your court was not going to recommend that it be an in-bank consideration, that the parties were free to ask for in-bank consideration, but you're correct. I did not do that initially. I think this case is ripe for in-bank consideration because the facts are different than in Wilchcombe. I see my time is up. If I could just finish the thought. In this case, there were no drugs on the boat like there were in Wilchcombe, and in this case, none of the defendants testified in Wilchcombe, they did. So, the facts are much different. Thank you. Thank you. Ms. Grillo. May it please the court. Lara O'Donnell Grillo on behalf of Appellant Serbio Bailtas Valencia. Your Honors, the record shows that Mr. Bailtas Valencia's trial counsel labored under an to raise a potentially exculpatory defense. Bailtas Valencia's trial counsel represented . . . Trial counsel was what? CJA or Federal Defenders or what? I believe that's correct. Which one? CJA. Okay. So, the trial counsel represented another defendant, Mr. Porter Carrero, in a separate but related criminal case, which I'll refer to as the first case. The record indicates that the first case was ongoing or at least pending on appeal at the time that Mr. Bailtas's trial . . . We know that. What is it that you contend that the district court judge should have done and was required to do and didn't do? What the district court should have done and was required to do was conduct a sufficient colloquy that would inform my client of the nature and consequences of the potential conflict. And, the fact is that didn't happen because both the district court and his conflicted counsel stated on the record that they believed there was no conflict. And so, that was the case that the district court committed. And what the district court should have done was recognize the conflict based on the prior case and appointed separate counsel. But he doesn't . . . the judge doesn't know the facts. The judge doesn't know which strategy is likely to succeed or not. What's . . . is he supposed to . . . I don't understand what the test you're requiring the district court to follow is. Well, Your Honor, the legal standard where an objection isn't raised at trial as it wasn't here because everything was operating under the belief that there was no actual conflict is that you need to show an actual conflict that adversely affected the lawyer's performance. Does it have to be apparent to the . . . evident to the district judge? No, Your Honor. I think it needs to be evident in the record. And I think there's sufficient evidence in this record to show the conflict. And so, what happened was in the first case, my client's counsel raised a defense. And specifically, I think, I don't know if he was . . . he wasn't lead on the argument, but this court has already recognized and accepted that the defense took a position raising the issue that the bails of cocaine at issue that were similarly wrapped, vessels within a day and a half of each other apprehended, a lot of similarities between the two cases. In that first case, my client's counsel had already taken and accepted a position blaming my client, Bailtis Valencia, for the bails. And so, then he arrives here at the second case, and he's essentially . . . I mean, certainly laboring under conflict, but doesn't even really have the option to take the opposite position of the potentially exculpatory defense. But, I mean, the timing wouldn't have been beneficial to your client, would it have been? I mean, Mr. Portocarrero's boat was later in time, so . . . I think that's correct. That's what this . . . So, there is a statement in the record referencing the Valois boat and then the other vessel being apprehended within 36 hours. But, I believe reading this court's recent opinion in February in the first case, it appears that that vessel may have been apprehended first, but that doesn't speak to when the bails were dumped. You know, it was in the same vicinity, very close in time. So, I really don't think that the . . . And, of course, this is an issue that should have been explored, or at least should have been considered by a counsel that wasn't laboring under the conflict. Ms. Carrillo, I want to talk about jurisdiction. Yes, Your Honor. Do you want to . . . Yes, I can address jurisdiction, of course. So, our position . . . We, of course, we have the arguments that we've raised that we recognize the contrary precedent and that we simply preserve the nexus argument in particular for further review. But, what we would like to argue today, or point out today, is a specific issue in this case where the government failed to prove a statutory basis for jurisdiction and the district court didn't properly find one that was based in the language of the statute. And, the district court actually found things . . . I mean, she said, as Judge Altanaga, no U.S. officer asked the master individual in charge to make a claim of nationality or registry under, you know, for the boat. That's correct. So, that's . . . So, what happened, Your Honor, was the government originally . . . the criminal complaint and the aff . . . supporting affidavit and the charging document, the indictment, all claimed a basis for jurisdiction under subsection C of the definitional provision of the statute that defines a vessel without nationality, which is how they would obtain jurisdiction. And, that . . . So, that was the original basis. So, we went . . . go through the trial under that claimed basis and that supporting affidavit. That was not proved, and it was not proved because there . . . it turned out there was no master individual in charge that made . . . that made a claim of registry. The evidence in the trial didn't bear out that subsection. The government abandoned that original basis. And, post-trial, when the jurisdictional issue was considered, they asserted under subsection B, which is the subsection that requires the officer . . . an officer of the United States authorized to enforce applicable provisions of the United States to make a request of the master individual in charge. That wasn't proved, and the government . . . Well, I mean, to the . . . I mean, there's an affirmative finding of fact that there was no request. Correct. So, there was . . . So, none of the two bases that the government asserted were established. And so, what the court ultimately concluded, which we believe is incorrect and is not supported by the statutory . . . The definition says vessel without nationality includes, and it has A, which is not relevant here, B and C, which are the two bases that the government tried to assert first at the beginning, and then the subsection B after the fact, neither of which was established. She interpreted the term includes as rendering the list A through C non-exclusive, meaning there could be something else. But the problem is that we don't know what that something else is. This is a definitional statute. It enumerates three bases, and what she suggests is that vessel without nationality could be anything with reference to international law. But the problem is the statute doesn't say that. And it also . . . I'm sorry to interrupt you, but one thing that jumps out at me is that subsection D of the statute does say includes, which sounds like it's not an exclusive list, and then subsection E says includes only. That's right, and I understand, I guess, what she was doing, but it's in the step two that we fail to connect it to the statute. For instance, let's assume that includes is flexible. It allows space for something other than A, B, and C. We don't know what that something else is, and I don't think the district court is at liberty to fill that in with none of the above, something under international law. That doesn't provide ordinary people notice of what is required to establish jurisdiction. There's no definition. There's no standard, and so that is the problem. Even if includes is not exclusive, there is no jurisdictional basis within the statute, and I think I'm over my time. You are, and it's completely my fault, so I'll give you your time for rebuttal, but I appreciate your help. Thank you, Your Honor. Thank you. Mr. Colon, good afternoon. Good afternoon, Your Honor. I'm Jonathan Colon on behalf of the United States. With me is Yvonne Rodriguez-Shack, who is one of the trial AUSAs on this case. Your Honor, I'm going to start with your jurisdictional question. Good. In Obando, this court recognized that a nationality claim for a vessel is an affirmative act, and it's something that can be taken only by the master, exclusively by the master. Obando recognized that things that are not provided in the statute, that are not listed in ways to make them. But Obando was talking about subsection E, which does say includes only. I don't think Obando solves your problem. Why do you think it does? First, I'm going to start with the language in D. So we'll start with the one that is operative here, and this is D-1B. So I can concentrate better. Is that the provision under which the government claims jurisdiction in this case? Absolutely, Your Honor, and it has been the consistent position. The complaint affidavit is not a charging document. Ever since jurisdiction was raised, both pre-trial, during trial, and post-trial, it has been the consistent position whenever jurisdiction was an issue to be decided by the trial court that no claim was made. I'm with you on that, but there's also no dispute that no request for a claim was made, right? Yes, absolutely, and I'm going to explain why. Okay. I'm sorry, if you had a question, I don't want to interrupt you. No, no, no, no, no. In D-1B, it says the master. I guess my question was, why don't you lose? I hope I can answer that question. Okay. In D-1B, it says the master or individual in charge fails on request of an officer of the United States to make a claim of nationality. So the person who was asked is the master. In this case— How do you know that? Because it says in D-1B, the master— No, in the facts of this case, how do you know the person you were asked was the master or the person in charge? Well, the reason it wasn't asked, and this is correct, at no point did the Coast Guard ask the master to make a nationality claim, and the reason was is because there was no one willing to admit to being a master. Now, here, if I could have an indulgence to the courts, let me go through some timeline, because I made a mistake in the brief, and I'd like to correct that mistake and make sure we talk about exactly who said what and when, because this informs, I believe, the district court's conclusion, a factual finding, that there was no master identified who would speak on behalf of the vessel. I'm pretty conversant with the record. I just don't see where in the statute you get to, well, nobody claimed to be the master, so the government wins. Well, I have two answers. First, like I said, in D-1B, it says the master or individual fails on request, so that's the person being asked. And two, in Obando, I think this court made it clear that the vessel speaks by the master and only through the master. That was both in the majority opinion that discussed the exclusive ways that a claim could be made and especially in Judge Black's concurrence, where she went on to greater detail to explain why, under admiralty law, a vessel can only speak through a master. A more practical explanation for why is that, and it shows why what happened in this case, if you get conflicting claims, if you have a, for instance, Obando said you cannot stand on a verbal claim by a non-master. Obando said would not count. And the reason is if you had multiple claims. So in this case, for example, we had the initial interview on there were two rescue boats. This was a sinking boat that got people onto two rescue boats, separated them. One on Able 1, two on Able 2. Cruz apparently asked on Able 1, although his report says he asked them when there was only one person on his boat, and that's by petty officer Guest's testimony and Lieutenant J.G. Black's testimony. So that's odd that his report speaks of asking them when there was only one person. Then they're transferred onto Lieutenant J.G. Black's rescue boat, where he goes down the line. Who is the master? They all refuse to identify a master. Now they're all together. Let me ask you this. Did anybody ask who's the individual in charge? I mean the term for that is master. No, but I mean the statute says master or individual in charge. They did not use the word individual in charge. Okay. Okay. So on Cruz's boat— But you figure if there's no master, then somebody could be the individual in charge. Well, they all say he went overboard. I mean they refer to there being a person. They all seem to think that there is such a person. They all claim he went overboard. I know, but so then why in the next question, who's the individual in charge now that the master's overboard? Well, I mean there is no second degree. I mean the person in charge is the person in charge. They refuse to be him. They say he went overboard. I just, you know, I don't see how the fact that the master is missing excuses you from the requirement under the statute to make a request of the nationality of the ship. Because Obando says a verbal claim by a non-master is not a claim. And the reason for that is if there's not one person who can speak for the vessel, then you run the risk of having multiple claims. This is why they ask again when they're together. Why isn't that what the statute contemplates? The statute definitely contemplates one claim because it lists in one of the – the statute incorporates the – I forget which treaty. I want to say it's the Law of the Sea Treaty, but I think that's the wrong term. But by reference, the statute incorporates a vessel that is assimilated to statelessness under the terms of the treaty. And again, Your Honor, I apologize. I think it's the Convention of the High Seas, I believe. And that talks about multiple claims. That's why you cannot have multiple claims. If a ship makes multiple claims or if two people claim to speak for the vessel. You're losing me. I don't understand what you're talking about. Okay, Your Honor. I will attempt to correct my mistake. If two people make a claim, if we're not listening and speaking for a master. It's not that complicated. If you can't – if nobody's willing to own up to being master, why isn't the next required question who's in charge? What if two of them do? What if what? If two of them do. You have to have one master. They've said he's gone overboard. Once the person who is the master has gone overboard, there's no one left to ask because why would one crew member's answer be any more authoritative on the vessel than another crew member's answer? Let's say the master was depressed and two days before jumped overboard. You're saying there's nobody who can be in charge of this ship? Yes. And how is that consistent with the statute that says you can ask the individual in charge? And this court has recognized that it speaks to one person. And if that one person does not make a claim under the terms of the statute, then no claim can be made. What if the one person ascended into heaven, left us? Then someone else would have to speak up. That answer doesn't make any sense. And when none of them would take responsibility to speak, that's the end of it. Someone has to be the one willing to speak. The Coast Guard can't make them speak. Now you're walking both sides of the street. Are you saying that had someone taken responsibility, a response from that person would have been okay? If they had said, where is the master? Master went to heaven. Master went to heaven the day before yesterday. I've been in this business longer than any of these kids who are on my crew. If one of them had spoken up and said, but I am in charge, then he could have spoken for the vessel. Oh, so the burden's on them. Yes. It is, Your Honor. Well, where does it say that in the statute? Obando has interpreted the statute to say the master is an affirmative claim made by the master. It is not something that the Coast Guard can appoint. It is not something the Coast Guard can make them speak. Let me ask you this. So we have this situation that apparently happens a lot. There's a go-fast boat. The Coast Guard boards the boat. What if nobody from the Coast Guard says anything? They just stand there. And none of the people on the go-fast boat say anything. Does the government claim statelessness there? Because, after all, you say the burden's on the people on the go-fast boat. If no one had asked who the master is, that would be a different situation. Of course it is. It's a hypothetical, she's asking. The Coast Guard, there are two purposes for this under the MDLA framework. This is a diplomatic allocation of authority between the United States and its treaty partners. That's not what she asked you. She asked you a simple question. Suppose the Coast Guard hadn't said anything. What happens then? In the first place, they would have no right to approach the vessel unless it was flying a flag or produced documents. So they have to ask in the first instance because, in the normal case, there are two steps of why this matters. Under the treaty regime that the MDLA implements, the first right is the right to get on the vessel in the first place. So that didn't happen here because this is a rescue operation. So normally the Coast Guard asks who's the master and looks for a flag and any registration documents presented because those are the three methods under the statute. Normally they ask before they get on the vessel or when they first get on because they're not allowed to be on a foreign nation's vessel. Let's just say they did what they had to do to get on the boat legally. But then once we start trying to determine the nationality of the boat, the Coast Guard says, well, I don't have any burden here. The burden's on these people in international waters. So they just don't say anything and everybody stands there and looks at each other. Can the government claim the boat is stateless based on those facts? Nobody says a word. Yes, the master has to speak, Your Honor. That is what the statute says. You're changing my hypothetical. Nobody says anything. Then they would not have made a claim. A verbal claim has to be made. If no one says anything, then they have not made a verbal claim. Suppose the Panamanian fishermen are not learned in international law. How are they supposed to know that they're obligated to say I'm the master or I'm someone in charge? Because the statute is not for their interest. The statute's jurisdictional provision is in order to protect the diplomatic relations of the United States and its treaty partners. The only reason this jurisdictional section comes up is to allocate between the United States and the treaty nation, any other nation that might have an interest in prosecuting. How it operates in the real world and what you're telling us, as I hear you, is that if these fishermen on the boat or whoever they are on the boat don't encant the magic words, they lose. Yes, I'm saying that. The reason I'm saying that, Your Honor, is that the statute provides that the jurisdictional defects in how this procedure is done are not a defense. The statute's reason for doing this is an allocation of prosecutorial authority between the United States and the foreign nation. The interests being protected here are the foreign nation's interests. As the court recognized in Hernandez, any defects or complaint are to be resolved nation to nation. It's not about whether the crew members know the magic words because it's not their interests being protected. It's the foreign nation's interests being protected. The United States has to make sure we're not boarding a vessel that a foreign nation has a prior claim to protect. We wouldn't want people boarding United States vessels. So the United States doesn't prosecute someone that a foreign nation has a prior claim of prosecutorial authority. That's what this provision is about. So the fact that the crew members don't know the magic words is not what the statute is aiming for. The statute has specific requirements that this court says in Obando cannot be changed. You follow what the statute says as to what constitutes a claim that triggers the foreign nation's interests. And here, that did not happen. Well, let me ask you this. So Judge Altanaga said because the D subsection of the statute just says includes, then, you know, just because the government didn't meet this requirement of B, then, you know, we can assume statelessness anyway even though they didn't meet one of those provisions of the statute. Do you accept that provision of the – I mean that interpretation of the statute? The court could affirm on other bases established by the record. For example. Is that a no? Then I misunderstood the question. Do you agree with Judge Altanaga's interpretation of the statute because it just says includes and doesn't say includes only where the government, in my opinion, didn't meet the requirement of B because they didn't request the nationality of the ship? So basically what she said was, well, because it says includes, you know, the fact that they didn't meet this one particularity of subsection B, then they get in anyway. Is that your interpretation of the statute as well? I think the answer is yes, but if I can try to explain because I'm not – again, I'm not sure I've understood the subclauses. One of these – a claim has to be made. If there is nothing in the record showing a claim was made under B, you look if a claim was made under A, that would still be a claim. So you have to look to see whether a claim was made. The government's position was no claim was made because no master made a verbal claim. If the master had made a claim or some valid claim had been made otherwise that the foreign nation could neither confirm nor deny, as there is evidence here, that would also be statelessness and that would be satisfied. If your interpretation is right, why would any sensible Coast Guard officer ever ask the question? Because if you don't ask the question, you're not going to get an answer, and you can always say, well, no claim was made. Because the Coast Guard, acting in good faith, Your Honor, wants to protect the United States' diplomatic treaty regime. This statute implements a complex web of treaties that we deal with foreign governments all the time. If we're trespassing on vessels that the nation of Colombia does not want us to trespass on. Well, these are conscientious officers. Their nose tells them there might be drugs on the ship. We're for them. They want to get on the ship and check out for drugs. You know, we live in a real world. And, Your Honor, respectfully, the real world includes maintaining our treaty obligations. Why would they ever ask? The efficacious approach would be to say nothing if you're right. Your Honor, we rely on our treaty partners. The entire framework of the MDALA relies on our cooperation with our treaty partners, ensuring that we aren't trespassing on other nations' vessels without their consent. The Coast Guard must ask in order to make sure we maintain, we get the information from the foreign nations. That's how we know to be patrolling in these areas. If we break down our treaty responsibilities, and if we're not acting diplomatically. If you really believe that, then it seems to me that your position would be they were required to ask. No, Your Honor, as this Court has recognized, the diplomatic courtesy we maintain by checking, even when we are not required to. In Obando and Hernandez, this Court has repeatedly recognized that the Coast Guard can go above and beyond its statutory requirements to ensure that we're maintaining our treaty requirements. We're not in a State Department press briefing. We're trying to get to the heart of this case. Your Honor, I respectfully believe that the Coast Guard went down the line of what the statute provides, and only the statute can define whether a valid claim was made. Nothing the Coast Guard says or does changes what the statute requires, and nothing the Coast Guard does in making its diplomatic courtesies can expand requirements of the statute, as this Court has found. I see I am over my time, unless you'd like me to address some of the other issues. I think we understand your argument. Thank you so much. All right. Rebuttal from Mr. Feigenbaum. Thank you, Your Honor. I'm not sure if I'm able to do rebuttal because there was nothing directed to the Miranda, the post-arrest pre-Miranda warning by the government. I think that might be right. But we're glad to see you. Yeah, I just wanted to be up front about that. So would that be? I think that's right. Thank you. You can give your time to Ms. Griot if you want to. I'm sorry? You can give your time to Ms. Griot if you want to. I shall. Thank you. I'm not sure how thrilled she is. Your Honors, the statute plainly requires, places the onus on the government under subsection D-1B to make a request. And your position is if no requests were made, what are the consequences? If no requests were made, the consequences are they haven't complied with the statute. They're boarding a vessel without making the basic required statutory request under subsection B. Would it deprive the government of jurisdiction in this case? Well, yes. It deprives the government of jurisdiction in this case for two reasons. Well, several reasons. They don't have jurisdiction under that subsection. They do not dispute. Which is the one they rely on. Which is the one they rely on. They abandoned the first one, so that is the one that they rely on now. And it just could not be more plain that subsection B says, a vessel without nationality is a vessel aboard which the master or individual in charge fails on request of an officer of the United States authorized to enforce applicable provisions of United States law to make a claim of nationality or registry for that vessel. So your position is a request is required by statute. A request is required by statute. And the request by the text of the statute can be directed to either the master or if the master is, as in my hypothetical, is in heaven, it can be addressed to the person in charge. Exactly. And is there an 11th Circuit precedent that qualifies your response or that informs your response? No, Your Honor. And, in fact, the district court agreed that jurisdiction was not established under that subsection. So I just, and in terms of protecting diplomatic relationships, I would imagine, although we're steering from the plain language of the statute, that if there's a requirement placed on an officer that Congress wants them to ask, that there's a reason for that rather than having them, you know, boarding vessels with impunity. And there are other ways to establish jurisdiction. Those were not established. And so the court was left to come up with some other basis, but the problem is that there was no other basis established in the record, and there is nothing else in the statute that would provide a basis for jurisdiction in this case. Thank you. Thank you. Thank you very much. Appreciate it. Interesting argument. Interesting. We gave you a hard time, but that's our job. We knew you had prepared, so you were ready for it. Thanks.